Guillermo Atiles Moréu, Administrador del Fondo del Seguro del Estado, recurrente, *v.* Comisión Industrial de Puerto Rico, etc., demandada; Fortunato Delgado Osorio, obrero occiso.

Núm. 366.—*Sometido:* Diciembre 12, 1946. *Resuelto:* Enero 13, 1947.

*A. de Jesús Matos, A. Sandín del Manzano* e *Ismael Marrero,* abogados del recurrente; *Diego O. Marrero,* abogado de los beneficiarios del obrero occiso.

El Juez Presidente Señor Travieso emitió la opinión del tribunal.

Fortunato Delgado Osorio trabajaba para el Programa de Emergencia de Guerra, en calidad de "laborer" en la reparación de una escuela pública en el pueblo de Carolina. El día 8 de octubre de 1945 se retiró a su hogar a las 4:00 de la tarde, al terminar su jornada de trabajo. Cinco días más tarde fué conducido enfermo al Hospital, en donde falleció minutos después de su llegada.

El Administrador del Fondo del Estado ordenó el cierre y archivo del caso, basándose en que por la investigación practicada no quedó comprobada la ocurrencia de accidente alguno, ni tampoco que la muerte del obrero fuera ocasionada por una enfermedad ocupacional reconocida por la ley y adquirida con motivo del trabajo. Recurrieron los beneficiarios del obrero ante la Comisión Industrial y ésta, en julio 15 de 1946, dictó su resolución declarando que el obrero había muerto a consecuencia de una pulmonía contraída por habérsele agravado su condición idiopática (monga), en el curso de su trabajo y como consecuencia del mismo. La Comisión revocó la decisión del Administrador y ordenó el pago de la compensación correspondiente a los beneficiarios. Denegada la reconsideración solicitada por el Administrador, interpuso éste el presente recurso.

Alega el recurrente que la Comisión Industrial erró al declarar compensable un caso en el cual no resultó probado un accidente de acuerdo con los preceptos de la Ley de Compensaciones por Accidentes del Trabajo.

De acuerdo con la prueba practicada en la vista ante la Comisión, el trabajo que hacía el obrero el día 8 de octubre consistía en repicar las paredes para cortar el empañetado viejo, usando para ello un cortafrío y un marrón que pesaba aproximadamente dos libras. En ese trabajo se levantaba mucho polvo, lo que hacía que el obrero estornudara mucho y se soplara la nariz con frecuencia. El obrero, quien era un hombre joven, fuerte y saludable, se quejaba ese día de un fuerte dolor de cabeza y sudaba mucho y como hacía mucho sol en el sitio donde trabajaba, el maestro de obras lo cambió para que trabajara a la sombra. En ese mismo día faltaron al trabajo cuatro obreros por estar todos ellos sufriendo de monga. El día 8 de octubre, cuando salió para el trabajo, el obrero tenía una fuerte gripe, tosía y tenía la nariz tupida; y cuando regresó a su casa por la tarde llegó con fiebre. Al día siguiente siguió con la fiebre y escupía

sangre. El doctor le recetó dos veces, sin verlo. El día 13 de octubre se empeoró, lo llevaron adonde el Dr. González y cuando éste fué a examinarlo encontró que ya había muerto.

Declaró el Dr. González que cuando vió al obrero en el cuarto de operaciones ya estaba muerto; que le dijeron que el enfermo hacía cinco días que tenía gripe, con mucha fatiga, dolor en el pecho, especialmente sobre el corazón; que tuvo que firmar la defunción "y supuse que fuera angina de pecho, creyendo que eso no excluye que fuera pulmonía"; que una pulmonía puede producir un dolor muy fuerte sobre la región del corazón; y que dados los antecedentes de este caso, existe una fuerte posibilidad de que la causa de la muerte fuera una pulmonía.

El Dr. Vadi, después de oír toda la prueba presentada, declaró que en su opinión "lo más probable es que el obrero haya muerto de una pulmonía"; que una persona que está en un estado físico de gripe, trabajando al sol, sudando y aspirando polvo tiene la resistencia por debajo de lo normal y está expuesto a una complicación; que una gripe no mata a nadie y que hasta ahora no se ha visto un caso que se haya muerto de monga; que para que una monga mate a uno, tiene que darle una complicación, una pulmonía, bronconeumonia o pulmonía doble; que la complicación más probable en un caso de gripe es la pulmonía.

Declaró el Dr. García Estrada que todo lo que se diga con respecto a este caso es meramente especulativo; que lo correcto hubiera sido practicar una autopsia para determinar la verdadera causa de la muerte; que un médico no puede llegar a una conclusión exacta de qué murió este hombre; que cree posible que el obrero muriera de un ataque de angina de pecho; y que para que se establezca definitivamente que el obrero murió de pulmonía, debió haberse practicado una autopsia.

Declaró extensamente el Dr. Cordero, llegando a la conclusión de que en su opinión el obrero no murió de una an-

gina de pecho. Dijo, además, que ''cualquiera de los procesos neumónicos pueden producirse como complicación de una influenza; como pudo haber una bronconeumonia, como una neumonia lobular.''

La Ley de Compensaciones por Accidentes del Trabajo núm. 45 de 18 de abril de 1935, Comp. 1941, pág. 376, dispone en su sección 1:

''§2. Las disposiciones de esta Ley serán aplicables a todos los obreros y empleados que trabajen para los patronos a quienes se refiere el párrafo siguiente, que sufran lesiones o se inutilicen, o que pierdan la vida por accidentes que provengan de cualquier acto o función inherente a su trabajo o empleo y que ocurran en el curso de éste, y como consecuencia del mismo o por enfermedades o muerte derivadas de la ocupación, según se especifican en la sección siguiente.''

■ Las conclusiones de la Comisión en cuanto a la causa de la muerte del obrero están sostenidas por la prueba testifical y por la pericial. No podemos decir que la Comisión errara al sostener que el polvo que el obrero inhalaba durante el curso de su trabajo fué la causa próxima de la complicación que le produjo la muerte. Es nuestro deber respetar dichas conclusiones. *Montaner* v. *Comisión Industrial*, 54 D.P.R. 722.

■■ No hay duda alguna en cuanto a que si el obrero, debido a su condición idiopática en el día 8 de octubre, se hubiese caído mientras trabajaba y perdido la vida como consecuencia de esa caída, sus beneficiarios tendrían derecho a la compensación concedida por la ley. En *Montaner, Administrador*, v. *Comisión Industrial*, 55 D.P.R. 900, al confirmar la decisión de la Comisión a favor de los beneficiarios de un obrero que mientras abría una zanja en una colonia de caña, sufrió un ataque epiléptico, cayó dentro de la zanja y se ahogó, dijimos:

''Si la caída del obrero Juan Matos hubiese sido motivada por su propia negligencia, seguramente el Fondo del Seguro del Estado no hubiera podido interponer la defensa de negligencia contribuyente

en oposición a la reclamación. No vemos razón alguna que nos obligue a establecer una diferencia entre la negligencia contribuyente y la condición idiopática del obrero, como causas determinantes de un accidente, cuando ni una ni otra aparecen incluídas entre las circunstancias que de acuerdo con la Sección 4 de la ley (supra) impiden la concesión de una compensación.''

Véanse: *Montaner v. Comisión y Sucesión Santiago*, 54 D.P.R. 121; *Montaner v. Comisión*, 55 D.P.R. 985 y *Montaner v. Comisión*, 54 D.P.R. 797.

En el caso de autos el obrero se encontraba enfermo en el momento en que comenzó a trabajar el día 8 de octubre de 1945. Se quejaba de dolor de cabeza, tosía y estornudaba con frecuencia, síntomas indicativos de que sufría de la enfermedad conocida por la monga, campo fértil para el desarrollo de un proceso neumónico que pudiera costarle la vida. No obstante el conocimiento que tenía de la condición idiopática del obrero, el patrono no solamente le permitió que siguiera trabajando, si que le asignó un trabajo que además de tener que hacerse al sol y de requerir un grande y continuo esfuerzo físico, levantaba gran cantidad de polvo, que inhalada por el trabajador no podía menos que agravar su condición idiopática, disminuyendo su resistencia, hasta hacerle víctima del proceso neumónico que le causó la muerte.

El tratadista Horowitz, en su obra titulada *"Injury and Death Under Workmen's Compensation Laws"*, Ed. 1944, pág. 147, dice:

"Las enfermedades no surgen necesariamente del empleo. Pero cuando se demuestra una relación causal entre la enfermedad y el empleo, y hay evidencia de repetidos aunque pequeños traumas sobre el cuerpo o el daño corporal resulta de la exposición a la intemperie o de un esfuerzo, aun durante un período de meses más bien que en un momento específico, la enfermedad es compensable, bien como una enfermedad enteramente nueva o como una enfermedad preexistente que ha sido agravada. Así, la inhalación de polvo de arena es considerada como un trauma repetido sobre los pulmones, y si agrava una tuberculosis durmiente, o produce una silicosis, estas enferme-

dades, estando casualmente relacionadas con el empleo surgen del mismo. La agravación de muchas enfermedades, tanto las de tipos usuales como las no usuales, es claramente compensable. Así, en muchos estados se han concedido compensaciones basadas en que un cáncer o tumor maligno (cuya causa es generalmente desconocida) ha sido agravado y su propagación acelerada . . . Cuando la adjudicación de compensación se basa en testimonio médico de que existe una relación causal, el fallo será sostenido, no importa la opinión privada de la corte en cuanto al cáncer.''

Véase: *Dupre* v. *Atlantic Refining Co.*, 98 Conn. 646, 120 Atl. 288.

Apareciendo de la prueba pericial practicada que existe la posibilidad de que el obrero muriera como consecuencia de una pulmonía y que la causa de ésta fuera la inhalación del polvo levantado durante el curso del trabajo, opinamos que la Comisión Industrial no erró al dictar la resolución recurrida, *la cual debe ser confirmada.*

El Juez Asociado Sr. Snyder no intervino.